FRED J. BUENZLE *vs.* NEWPORT AMUSEMENT ASSOCIATION.

FEBRUARY 10, 1908.

PRESENT: Douglas, C. J., Dubois, Blodgett, Johnson, and Parkhurst, JJ.

(1) *Measure of Damages for Refusal to Admit Ticket Holder to Place of Amusement.*

The proprietor of a place of public entertainment is under no implied obligation to serve the public. By the sale of a ticket he creates contractual relations with the holder of it, and whatever duties grow out of those relations he is bound to perform, or respond in damages for breach of contract. No analogy can be drawn between such place of entertainment and a corporation affected with a public duty.

Where plaintiff who had purchased a ticket of admission to defendant's dance hall was refused admission on the ground that he was in uniform, and was tendered the price of the ticket, on action brought by him:—

*Held,* that the damages must be confined to the actual pecuniary loss, and could not be extended to include mental suffering.

Cases considered and discussed by the court.

ASSUMPSIT. Heard on exceptions of plaintiff, and overruled.

PARKHURST, J. This is an action of assumpsit, brought by the plaintiff, Fred J. Buenzle, against the Newport Amusement Association.

The declaration alleges the liability of the defendants in damages to the plaintiff by reason of a breach of the defendants' contract arising out of the sale of an admission ticket to the defendants' dance hall and the refusal of the defendants to admit the plaintiff thereto on September 8, 1906.

The case was tried before the Superior Court and a jury on the sixth day of June, 1907. The evidence of the plaintiff showed that he purchased a ticket of admission to the defendants' dance hall in civilian clothing on September 8, 1906; that

thereafter he went to a field near said dance hall and took off his civilian coat and hat and put on the cap and the coat which constitute the uniform of a petty officer in the United States navy. The evidence further showed that after making such change in his attire the plaintiff presented his ticket of admission at the defendants' dance hall and was refused admission thereto on the ground that he was in uniform; that the twenty-five cents paid for said ticket was offered to the plaintiff, but that he went away without waiting to have the price of said ticket refunded.

There is also evidence that some other persons were present at the time, and that the plaintiff felt humiliated by reason of the refusal of the defendants to admit him to said dance hall.

Upon the completion of the evidence on behalf of the plaintiff the defendants moved the court to instruct the jury to bring in a verdict for the plaintiff for the sum of twenty-five cents, that being the price paid for said ticket of admission by the plaintiff, and there being no evidence that the plaintiff had been subjected to any other expenses incident to the purchase and repudiation of said ticket. The court so instructed the jury, and a verdict was rendered for the plaintiff for the sum of twenty-five cents.

The specific question raised upon the record is the correctness of the ruling of the justice of the Superior Court, in excluding the consideration of the plaintiff's humiliation as an element of damages, and in instructing the jury upon the evidence to bring in a verdict for the plaintiff in the sum of twenty-five cents.

It is admitted by the plaintiff that he had been informed that admission to this dance hall was denied to men in uniform; and is also admitted by him that he was guilty of a breach of regulations, for which he was liable to punishment, in presenting himself at the pavilion in citizen's clothing when he purchased the ticket. It is evident, therefore, that he was attempting "to make a case," in doing as he did. In his cross-examination he testifies as follows: "Q. You expected to be refused when you presented that ticket in uniform, didn't you? A. Not exactly. I wished to know if I would be refused. I

wished to know, if there was any discrimination, whether it was against me personally, for any personal disqualification, or whether it was against the uniform. Q. But you expected it, and you wanted to find that out. Answer my question. You expected to be refused admission, didn't you? A. I wasn't sure. I heard the men were discriminated against for the blue blouse and the shirt sleeves, but I didn't expect to be refused admission. Q. You did not. A. I didn't expect to be refused admission in a white shirt and a collar and tie, as any citizen, with only the difference of a rating badge and brass buttons." If he had simply desired to find out whether men in uniform were excluded, he could easily have ascertained that fact (without breach of naval regulation) by presenting himself in uniform at the time of the purchase of the ticket; and he would then, doubtless, have been informed of the rule regarding uniforms and would have been refused a ticket unless he agreed to comply with the rule. There would then have been no issue of the ticket, and no case by reason of its repudiation; and there need not have been any public humiliation, unless the plaintiff himself saw fit to publish the fact that he had been refused admission on account of his uniform. Such humiliation, therefore, as the plaintiff has suffered, under these circumstances, has been occasioned by his own acts.

It is further to be noted in this case that the refusal to admit the plaintiff was not absolute. He was offered the use of a civilian's coat, and told that if he would change into such coat, so as not to appear in uniform, he would be admitted.

But aside from the above circumstances, which differentiate this case from others herein cited, upon general principles applicable to cases of this character, we do not find a single case cited, by counsel for either party, where the suit is on the contract, where the rule of damages is stated otherwise than substantially as held by the Superior Court in its direction to the jury. The very first case cited on the plaintiff's brief, in support of his right to maintain an action of assumpsit, is *Horney* v. *Nixon*, 1 L. R. A. (N. S.) 1184, (213 Pa. St. 20). In this case, decided in 1905, we find that the Supreme Court of Pennsylvania, after a careful review of the authorities,

holds that a theatre ticket is a mere license, for the revocation of which, before the holder has actually been given and taken his seat, the only remedy is in assumpsit for breach of the contract; the court says, p. 1118: "If the contract with him was broken, he is entitled to nothing more than the actual damages for the breach, and these, according to the testimony of the treasurer of the appellees, were tendered to him." And this case specifically distinguishes the case of *Drew* v. *Peer*, 93 Pa. 234, where the plaintiffs, being colored people, were violently and rudely ejected and injured, and where the suit was for such injury and not for breach of any contract. And that case is declared to be *obiter dictum* in so far as it holds that such a theatre ticket is anything more than a mere revocable license.

The second case cited by the plaintiff is *Burton* v. *Scherpf*, 1 Allen (Mass.), 133, in which the Supreme Judicial Court of Massachusetts held that a ticket of admission to a concert is only a revocable license to the purchaser to enter the building in which it is given, and to attend the performance; and if revoked before the performance has commenced, and before he has taken the seat to which the ticket entitles him, and he remains therein after notice of the revocation and refuses to depart upon request, he becomes a trespasser and may be removed by the use of force necessary for that purpose; and his only remedy therefor is by an action upon the contract.

We find it to have been the settled rule of law for many years, that a ticket of admission to a race-track, a theatre, a concert, or any such entertainment is a mere license, revocable at the will of the party issuing the same; and that the rule of damage recoverable has been the amount of pecuniary loss actually suffered in all cases where the suit has sounded in contract; and it has been held in all these cases that there is no tort in such revocation, and that the proper suit is in contract for the recovery of such pecuniary loss. *Horney* v. *Nixon*, 1 L. R. Ann. (N. S.) 1184 (1905), 213 Pa. 20; *Collister* v. *Hayman*, 1 L. R. Ann. (N. S.) 1188 (1905), 183 N. Y. 250; *Greenberg* v. *Western Turf Ass'n.* 140 Cal. 357, 360, 361 (1903); *Purcell* v. *Daly*, 19 Abb. N. C. 301; *Pearce* v. *Spalding*, 12 Mo.

App. 141; *Burton* v. *Scherpf*, 1 Allen, 134; *McCrea* v. *Marsh*, 12 Gray, 211; *Wood* v. *Leadbitter*, 13 Mees. & W. 838.

But the plaintiff, while admitting that the current of authority down to 1905 has been as above, strenuously contends that the rule of damages adopted in the cases above cited is too narrow, and should be extended to include compensation for mental suffering, humiliation, loss of social standing, &c., on the analogy of cases for breach of contract of marriage, and of cases for breach of contract of carriage; such as cases against railroad companies or other common carriers, telegraph companies, &c., where failure to deliver dead bodies in time for proper funeral services, or failure to deliver telegrams relating to sickness and death, have caused mental suffering to the plaintiff for which recovery has been allowed in suits for breach of contract, in addition to recovery for mere pecuniary loss. The argument is ingenious, but not convincing. The cases with which it is sought to analogize the case at bar, referred to above, are all cases which have to do with contracts largely involving feeling and sentiment as in contracts of marriage, or contracts relating to illness, death, and burial, where the feelings and sentiments of the complaining party are so involved and inwrought that they form a necessary and unavoidable ingredient in the matter of the contract and are very properly held to be within the contemplation of both parties as an inducement and consideration of the contract, and so to be considered in the award of damages for the breach. These cases go far beyond any proper rule which could be adopted in this case.

If, indeed, the plaintiff had been seeking to attend a great patriotic demonstration, where the flag of our country and the uniforms of its army and navy were to have been exhibited for the edification of the public and for the inculcation of patriotism, and he had, after having been admitted to the entertainment, been expelled with indignity to his mortification and disgrace, and with insult to his uniform, an analogy more or less complete might have been drawn between these suppositious circumstances and the numerous cases cited by the plaintiff where the feelings and emotions aroused resulted in

mental suffering, and might have been the subject of compensatory or even of exemplary damages. The mere desire and intention to attend a theatrical performance, a dance, a concert, a race or other such amusement, can not be held to involve any such feelings, sentiments, affections, passions, emotions or other mental agitations, as in the cases cited by the plaintiff in the endeavor to extend the rule.

In *Pearce* v. *Spalding*, 12 Mo. App. 141, at p. 144, the court holds as follows: " Theatres are not necessities of life, and the proprietors of them may manage their business in their own way. If that way is unfair or unpopular, they will suffer in diminished receipts. *Clifford* v. *Brandon*, 2 Camp. 358–368.

"But suppose that defendants had offered to plaintiff, in express terms, his choice of seats, provided he were first at the box-office at nine o'clock on February 7th, and, by extraordinary exertions, he had got there at that hour, and the defendants, out of mere caprice, had determined to close the house, or to throw it open to the public, or to hold a prayer-meeting in it during the week advertised for the opera; to what damages would plaintiff have been entitled for the false representation? Clearly he would have been entitled to no damages except for some loss that could be estimated by a money standard. He might recover, perhaps, for loss of time, and for car-hire. He could recover nothing, we think, for the mental anguish occasioned by not hearing 'Fra Diavolo' or 'Lucie di Lammermoor,' any more than he could have recovered for any agonies that he might possibly have endured had he been present at the opera, and had the music been so excruciatingly bad that any intervals of silence would have come like so many poultices, 'to heal the wounds of sound.' The petition does not allege that plaintiff suffered any loss that can be estimated by money. It says nothing as to expenses, or as to the value of his time.

"It has been held, indeed, that where one who has actually purchased his ticket to the theatre, no matter what his musical tastes may be, or what delight he may anticipate, is prevented from entering by the management, with no rudeness or unnecessary force, he can not maintain an action of tort for the exclusion; and that his recovery must be upon the contract;

and the measure of damages is the money paid for the ticket and all actual legal damages sustained by the breach of contract.  *McCrea* v. *Marsh,* 12 Gray, 211."

The two latest cases cited, viz.: *Horney* v. *Nixon* (*supra*) and *Collister* v. *Hayman* (*supra*), both decided in 1905, respectively, by the Supreme Court of Pennsylvania and by the Court of Appeals of New York, expressly repudiate the analogy attempted to be drawn between a theatre and a corporation affected with a duty to the public, like a common carrier.

Thus in *Horney* v. *Nixon,* 213 Pa. St. 20, the court says, p. 24: "In support of the contention that the appellant has a right of action in trespass, decisions in cases of common carriers are cited, in which trespass was held to have been the proper form of action for refusal to carry passengers, or for unlawfully ejecting them without force and violence.  But the difference between the duty of a common carrier and that of a theater proprietor has been wholly overlooked.  That of the former is absolute to carry whoever may wish to be carried.  It is a duty growing out of no contract, but rests at all times on the common carrier in return for the franchises and privileges conferred by the state.  If, in violation of this duty, it refuses to receive a passenger, or unlawfully ejects him from one of its conveyances, trespass will lie upon the disregard of the implied obligation to serve the public, or the tort may be waived and assumpsit maintained for a breach of the contract of carriage, if one has been entered into.  .  .  .    The proprietor of a theater is a private individual, engaged in a strictly private business, which, though for the entertainment of the public, is always limited to those whom he may agree to admit to it.  There is no duty, as in the case of a common carrier, to admit every one who may apply and be willing to pay for a ticket, for the theater proprietor has acquired no peculiar rights and privileges from the state, and is, therefore, under no implied obligation to serve the public.  When he sells a ticket he creates contractual relations with the holder of it, and whatever duties on his part grow out of these relations he is bound to perform, or respond in damages for the breach of his contract, if it is of that only that complaint can be made."

So in *Collister* v. *Hayman*, 183 N. Y. 250, the court says, p. 253: "A theatre ticket is a license, issued by the proprietor pursuant to the contract as convenient evidence of the right of the holder to admission to the theatre at the date named with the privilege specified, subject, however, to his observance of any reasonable condition appearing upon the face thereof. The license, although granted for a consideration, is revocable for a violation of such condition by the holder of the ticket in the manner specified therein;" and cites the cases above referred to. And the court later (p. 254) draws the distinction between a theatre and a carrier of passengers in the following language: "The defendants were conducting a private business which, even if clothed with a public interest, was without a franchise to accommodate the public, and they had the right to control it the same as the proprietors of any other business, subject to such obligations as were placed upon them by the statute hereinafter mentioned. Unlike a carrier of passengers, for instance, with a franchise from the state and hence under obligation to transport any one who applies and to continue the business year in and year out, the proprietors of a theatre can open and close their place at will and no one can make lawful complaint. They can charge what they choose for admission to their theatre. They can limit the number admitted. They can refuse to sell tickets and collect the price of admission at the door. They can preserve order and enforce quiet while the performance is going on. They can make it a part of the contract and a condition of admission, by giving due notice and printing the condition in the ticket, that no one shall be admitted under twenty-one years of age, or that men only or women only shall be admitted, or that a woman can not enter unless she is accompanied by a male escort and the like. The proprietors in the control of their business may regulate the terms of admission in any reasonable way. If those terms are not satisfactory, no one is obliged to buy a ticket or make the contract. If the terms are satisfactory and the contract is made, the minds of the parties meet upon the condition and the purchaser impliedly promises to perform it. There is no rule of law that prevents the enforcement of the contract in

the manner provided thereby, which is to refuse admission to the holder of a ticket who bought it on the sidewalk. Where the condition is part of the contract at its origin, it continues a part thereof as long as it exists and binds all subsequent holders with notice."

(1)    In view of these well-considered cases, affirming, as they do, the line of authority so long established, we are of the opinion that the rule of assessment of damages in this case must be confined to the actual pecuniary loss and can not be extended to include mental suffering as contended by the plaintiff.

The plaintiff contends that the rule has been extended to allow recovery beyond the price of admission for "sense of insult or indignity, mortification or wounded pride," and cites *Smith* v. *Leo*, 92 Hun. (N. Y.) 242; *Cremore* v. *Huber*, 18 App. Div. (N. Y.) 231; and *MacGowan* v. *Duff*, 14 Daly (N. Y.), 315. In *Smith* v. *Leo* (*supra*), the plaintiff, after paying admission fee, was admitted to defendant's dancing class and allowed for a time to dance with the members, and was then expelled, for no fault of plaintiff. As the court says, p. 243: "So that the defendant impliedly not only deprived the plaintiff of his right, but, with indignity and disgrace, put him out of the hall where, by his contract with defendant, he had a right to be." The suit, therefore, was expressly found by the court to be for the recovery of damages for the indignity and disgrace and not upon the contract.

In *Cremore* v. *Huber*, 18 App. Div. (N. Y.) 231, the plaintiff, a colored man, brought suit to recover damages for an alleged assault, consisting in his having been forcibly ejected from and denied the privileges of a place of amusement because of his color; and the whole right of recovery was based upon the assault and indignity to which he claimed to have been subjected.

In *MacGowan* v. *Duff*, 14 Daly (N. Y.), 315, plaintiff, through mistake of the ticket seller, did not receive tickets for the night when he attended the theatre, and was required to give up his seat to the party holding the proper ticket for that night. He gave up his seat and left the theatre, without force or ill treatment, and the opinion simply turns upon an erroneous instruc-

tion by the trial judge to the jury that "if there was a disposition on the part of the defendant's agent to insult the plaintiff, and subject him to contempt and ridicule, which could only proceed from motives or feelings of malice, then the law permits the imposing of exemplary damages." As there was absolutely no evidence to support this instruction, the court sent the case back for a new trial.

It will be seen, therefore, that these cases in no way weaken or modify the doctrine of the leading cases above cited.

We are of the opinion that the Superior Court correctly stated the law to the jury in its direction to return a verdict for the price of the ticket only, no other pecuniary loss or damage having been proved.

It may be, indeed it undoubtedly is, deplored, by many persons, that there should be any discrimination against the uniform of our army and navy in the matter of admission to public entertainments; and it is no doubt believed that such discrimination tends to belittle the wearer of the uniform, and the uniform itself, in a way that interferes with the service of the country and with the patriotism and *esprit de corps* which lie at the foundation of all efficient service in either branch of the national defence. As to the reasons which actuated the defendants in making the rule here complained of, we have no knowledge, as no testimony was offered upon that subject. It was stated in argument, and not denied, that the rule of exclusion applied to all uniforms, whether military or naval or civil, and included chauffeurs, coachmen, or other servants, firemen—in fact all uniforms of whatever character. As to these facts we are not advised; but it is to be noted, in conclusion, that military and naval uniforms are not intended as a badge of social equality, but on the contrary they are evidences of rank and distinction as between the different grades of superior officers, petty officers, privates and seamen, and in no sense in themselves should be regarded as evidences of right of social recognition or of any distinction other than that required and recognized as an essential part of an efficient military and naval organization. We can not believe that the mere exclusion of uniformed men from public entertainments

ought to be regarded as a stigma placed upon either the uniform or the wearer, or as intended to have any such effect. If, however, such discrimination is deemed to be a matter of grave public consequence, it rests with the law-making power to afford a proper remedy, by statutes, such as have been passed by the Congress, and also by this and other States, relating to the national flag, or by the States in reference to public entertainments forbidding discrimination on account of race, color, or previous condition of servitude, and by some States as to exclusion from public entertainments for other causes. See Pub. Laws, Chap. 986, Apl. 3, 1902; Gen. Laws, Chap. 277, Sec. 27; *Greenberg* v. *Western Turf Ass'n.*, 140 Cal. 360. In the absence of such legislative action by this State, covering this case, we can only declare the law as we find it to be.

The plaintiff's exceptions are overruled, and the case is remitted to the Superior Court for the entry of judgment upon the verdict.

*Green, Hinckley & Allen, and John C. Burke,* for plaintiff.
*J. Stacy Brown,* for defendant.