CLARENCE E. MERCER and MARY E. SCHUSTER,

*vs.*

THE ROCKWELL OIL COMPANY, a corporation of the State of Delaware, JOSEPH N. SCHUSTER, E. S. WENKER, C. C. HEICHEMER, MARY L. CAREY and C. M. FORQUER.

*New Castle, October 14, 1949.*

*Albert Simon,* for plaintiffs.

*Robert C. Barab,* and *John A. Brown,* of Chicago, Illinois, for defendant Rockwell Oil Company.

*Caleb S. Layton,* of the firm of Richards, Layton and Finger, for individual defendants and counterclaimant.

SEITZ, Vice Chancellor: This matter originated as a petition under *Section* 31 of the *General Corporation Law, Rev.Code* 1935, § 2063, to review an election of directors and officers held in 1943. The petition also requests the appointment of a master to hold an election of directors since both sides concede that no election has been held since 1943. In this case two factions of a family are at odds. One faction, the Martin Schuster faction (hereinafter called the "Martin faction") contends that the 1943 election was valid. The Joseph Schuster faction (hereinafter called the "Joseph faction") contends that it was invalid. Martin and Joseph are brothers. Both factions concede that a master-directed stockholders' election is in order. However, the real issue involved is admittedly the ownership of the stock. The parties stipulated that this court should determine the

entire stock ownership. Consequently, this is the decision as to the ownership of The Rockwell Oil Company stock (hereinafter called "Rockwell").

In 1921 Martin B. Schuster, father of Mary E. Schuster, purchased from the government Cheyenne lease number 038000. He purchased this lease for the firm of M. B. and J. N. Schuster, and he used the firm's assets in making the purchase. The firm was operated exclusively as a partnership by Joseph and Martin Schuster. Arthur Schuster, a brother who was employed by the firm, admittedly had no interest in the firm.

In 1922 a company known as Interior Oil and Development Company (hereinafter called "Interior") was organized. Thereafter, the firm turned over the Cheyenne lease to Interior by the execution of an instrument whereby Martin B. Schuster held the lease in trust for Interior. Interior had 500,000 authorized shares of $10.00 par value stock of which about 306,000 shares were outstanding. The firm of M. B. and J. N. Schuster received 231,000 shares of the stock in return for the Cheyenne lease and other rights transferred to Interior.

Arthur Schuster worked for the firm of M. B. and J. N. Schuster even before the acquisition of the Cheyenne lease. Later he worked for Interior and actually operated the oil fields held under the Cheyenne lease. He held no stock of record in Interior. Martin Schuster testified that 5,000 shares of the record stockholdings of the firm of M. B. and J. N. Schuster in Interior belonged to Arthur. This is denied by Joseph. This creates the real issue in the case.

Martin Schuster testified that Arthur Schuster gave Interior two leases, a quit-claim deed to land, and paid for the expenses incident to the application for oil and gas property permits. This, according to Martin, along with Arthur's services, constituted the consideration for granting Arthur a 5,000 share interest in the firm holdings in Interior. There

seems to be no unequivocal documentary evidence to support this testimony. Since Martin appeared to have Interior's records, I believe he should have shown, if possible, the particular properties conveyed by Arthur. Arthur apparently held certain Interior property, but the documentary proof shows that he held it as trustee for Interior.

In 1931, because of financial difficulties, Martin and Joseph decided that the firm would turn back, *inter alia*, 154,000 shares of Interior's stock in return, *inter alia*, for the Cheyenne lease. In order to effectuate this plan, the Cheyenne lease was first assigned to an employee named Treglown. The evidence did not convincingly demonstrate that Arthur's alleged stock interest was involved in the transaction whereby the firm turned in only part of its Interior stockholdings in return for the Cheyenne lease, and there is reason to infer that Arthur's alleged 5,000 shares were among the shares turned back to Interior. The firm presumably retained an amount of Interior's stock which far exceeded Arthur's alleged interest.

Treglown held title to the Cheyenne lease until a corporation known as Oil Corporation of America (hereinafter called "Oil Corporation") took title by a transfer made in April, 1932. Oil Corporation had 4,000 shares of stock outstanding. The 4,000 shares of Oil Corporation were originally issued, 3,900 shares to Clarence Mercer, 10 shares to Thomas Mercer, and 90 shares to August Wicklund. Later Wicklund endorsed his certificate in blank and gave it to Thomas Mercer. On April 2, 1932, Clarence Mercer executed a trust agreement in which he recited that he held record title to 3,900 shares of Oil Corporation as trustee, and that the real owners of the stock were Mary E. Schuster, who owned 1,950 shares, and Mary Louise Carey, who owned 1,950 shares. Martin Schuster testified that Thomas Mercer held the other 100 shares in trust for Arthur Schuster. There is no written evidence to support this testimony. One wonders why trouble was taken to draw up

and execute a trust instrument showing the real owners of only 3,900 shares. Arthur was then living and it is clear that Thomas Mercer was like Clarence, subject to Martin Schuster's control. Indeed, I believe the Mercers were under Martin's exclusive control at all times here material.

In 1937 Rockwell was organized with a capital stock of $100,000.00 consisting of 20,000 shares at $5.00 each. In June 1937, Thomas Mercer ordered the oil lease transferred to Rockwell. A letter dated June 3, 1937 and signed by Mary E. Schuster, Veronica Schuster and Thomas H. Mercer and addressed to Thomas H. Mercer was introduced in evidence. This letter set forth that 9,750 shares of the Rockwell stock were owned by Mary E. Schuster and 500 shares by Veronica Schuster, and the remaining 9,750 shares were to be held for such persons as Thomas Mercer ascertained to be the true owners. Although the letter is dated June 3, 1937, Veronica Schuster testified that she signed this letter in 1941. It was not until around this time, she testified, that she heard through Martin of Arthur's possible stock interest.

Arthur N. Schuster died in September 1937. From July 1937 until about the fall of 1941 Joseph N. Schuster handled the funds and the management of the operation of the Cheyenne lease. Trouble then arose between the brothers and thereafter Martin took control. Since that time, the two factions have been engaged in a dispute as to Joseph's management during his tenure. When prolonged settlement negotiations failed, an accounting action was instituted against Joseph in the Illinois Federal Court. Subsequent events must be judged in the light of this fierce struggle.

In August 1942, Joseph Schuster caused Veronica to execute a power of attorney in favor of Joseph's son-in-law, with respect to any interest she might have in any Rockwell stock. This was done after Martin delivered to Jo-

seph's attorney the letter dated June 3, 1937 which recited a 500 share interest in Veronica.

On March 27, 1943, Clarence E. Mercer issued all of the stock of Rockwell to himself, except 20 shares which were issued to Thomas H. Mercer. Apparently these 20 shares were later assigned to Clarence Mercer. On the same date he executed a trust agreement in which it was recited that the 20,000 shares of stock were in payment to Oil Corporation for the Cheyenne oil lease (although Thomas Mercer or his order received property other than this lease when the 4,000 shares of Oil Corporation were turned back to Oil Corporation). It was further recited that

"in accord with the agreement of the parties entitled to the various shares of stock, there was issued in my name and I now hold said stock for and in behalf of the following enumerated persons, in manner and quantity as follows:

"9,750 shares of the capital stock of The Rockwell Oil Company of Delaware, for and in behalf of Joseph N. Schuster and Mary Louise Carey, jointly.

"9,550 shares of the capital stock of The Rockwell Oil Company of Delaware, for and in behalf of Mary E. Schuster.

"500 shares of the capital stock of The Rockwell Oil Company of Delaware, for and in behalf of Veronica Schuster.

"200 shares of the capital stock of The Rockwell Oil Company of Delaware, for and in behalf of Clarence E. Mercer.

"I further aver that I still hold the 9,750 shares for and in behalf of Joseph N. Schuster and Mary Louise Carey as collateral security for the indebtedness of Joseph N. Schuster to the Rockwell Oil Company."

This instrument was prepared at the request of Martin Schuster exclusively. At the time of its preparation and execution Joseph Schuster had no knowledge of this instrument. As previously stated, it is clear from the evidence that Clarence Mercer was acting in concert with the Martin faction and not with the Joseph faction.

On May 17, 1943, an alleged stockholders' meeting was held at which time three directors were purportedly elected

—all of the Martin faction. None of the Joseph faction attended. They urge that the meeting was invalid for numerous reasons.

Finally we come to the instrument under which Mary E. Schuster—Martin's daughter—claims to own the 500 shares formerly owned by Veronica—Arthur's widow. By an instrument of assignment dated January 21, 1944, Veronica Schuster purported to assign to Mary E. Schuster all of her right, title and interest to the Rockwell stock held on her behalf. She also revoked any previous power of attorney signed by her. Martin paid Veronica $500.00 in cash with an agreement to pay her an additional $1,000.00 for the assignment of her stock interest in Rockwell on condition that the 500 shares were lawfully issued to Mary E. Schuster.

The Martin faction contends that Arthur Schuster was originally the owner of the interest which Veronica later assigned to Mary E. Schuster. The Joseph faction denies that Arthur ever had a stock interest in any of the corporations involved. It becomes necessary, therefore, to scrutinize the chronological development of events in order to ascertain which party is entitled to belief.

The ultimate problem confronting the court is to ascertain the present stock ownership of Rockwell. Rockwell has 20,000 shares of authorized stock. It is conceded that all of these shares are outstanding. The Martin faction concedes that Clarence E. Mercer is the owner of 200 shares, although the exact date of acquisition is not before me. That same faction concedes that Joseph N. Schuster is the owner of 9,750 shares. The Joseph faction contends, however, that Joseph's daughter owns 10,000 shares. Martin Schuster contends that his daughter is the owner of 10,050 shares—9,550 directly and 500 shares as assignee of Veronica. Thus, there is a dispute as to only 500 shares of stock. The Martin faction contends that Martin's brother Arthur was entitled to and his wife Veronica, his widow,

became the beneficiary of what now amounts to the 500 shares of stock in dispute, and that she, by valid assignment, assigned the 500 shares to Martin Schuster's daughter. Joseph Schuster testified that he never agreed that Arthur Schuster should have any stock interest in Rockwell or any of its predecessors; that Joseph and Martin through their firm each owned the same interest in Interior, and since Joseph never agreed to a change in this interest, the Joseph faction still owns 50% of the stock of Rockwell.

The sole substantial issue involved is as to the existence of the stock ownership, if any, of Arthur in Rockwell and its predecessors. Incidentally, Arthur never took any part in the "management" side of any of the companies or the firm.

It is admitted that most of the stock of Interior—the first company—was held by the firm of M. B. and J. N. Schuster. There was introduced on behalf of the Martin faction a piece of paper purportedly showing the stockholdings of the Schusters in Interior. Admittedly no shares of Interior were registered in the name of Arthur Schuster, but a slip attached to this paper purports to show Arthur as the holder of 5,000 shares. I am not clear whether this paper was relied on as a firm record or as Martin's personal record. Joseph denied having any knowledge of this record, and there is no proof that he helped make that record. Martin Schuster's explanation of Arthur's equitable ownership in Interior is based on the property which he says Arthur assigned to Interior as well as the services rendered by Arthur to the firm. Joseph Schuster denies having any knowledge of or having consented to any stock ownership in Arthur Schuster. He said that Arthur was paid for his firm services. The problem is particularly difficult because at no time up to the present has any of the stock of Interior, Oil Corporation or Rockwell been issued in the name of the real owners.

There was concededly a certain consistency in the evi-

dence introduced by the Martin faction which indicated that Martin Schuster and his daughter, who is the real owner of the Martin faction stock, recognized that they did not own 50% of the stock of Oil Corporation and later Rockwell. Thus, in a bill for a receiver filed in this court by Mary E. Schuster on June 14, 1941, she alleged that she was the equitable owner of 1,950 shares of the Founders' Stock of Oil Corporation. There were only 4,000 shares of Founders' Stock then outstanding. Thus, by claiming only 1,950 shares, Mary Schuster was recognizing the ownership of 2,050 shares in other persons. The Joseph faction concedes that at no time did it claim to own more than 2,000 shares of the Founders' Stock. While obviously not in irreconcilable conflict with the Joseph faction's position, this allegation is consistent with the Martin faction's contention that 100 shares of Oil Corporation stock was held for the benefit of Arthur Schuster and later his wife. It must also be noted that this allegation of ownership of less than 50% of the stock was made at a time when the Martin faction was not holding any assignment from Veronica Schuster of her interest in Rockwell stock. Later instruments executed by the Martin faction support that position. However, I note that they were never signed or acknowledged by a member of the Joseph faction until after Joseph and Martin started to feud in 1941.

By letter dated June 3, 1937, Mary E. Schuster and Veronica W. Schuster instructed Thomas H. Mercer, presumably acting as president of Oil Corporation, to assign the lease to Rockwell for 20,000 shares of Rockwell's stock. It recited that of the 20,000 shares, 9,750 were the property of Mary E. Schuster and 500 shares were the property of Veronica W. Schuster. It directed that the balance of the stock amounting to 9,750 shares was to be received by Mercer for the benefit of those persons "who you will ascertain are lawfully entitled to the same." Thomas H. Mercer's name was also endorsed on this letter and on the back of this letter appears the following:

"Any interest evidenced by the instrument on the reverse side hereof is covered by a power of attorney bearing date of August 21, 1942.
                                              Mrs. Veronica Schuster
"Subscribed and sworn to before
me this 21st day of August 1942
       "Joseph B. Brodie
          "Notary Public"

The quoted material written on the back of the letter dated June 3, 1937, was admittedly written by Veronica Schuster, and was written in the presence of Joseph Schuster's attorney, and, I infer, at Joseph Schuster's request. The power of attorney was dated August 21, 1942 and signed by Veronica Schuster. It recites that she is appointing J. Campbell Carey—Joseph Schuster's son-in-law— her lawful attorney to "determine all right or rights that she may have, individually or as the wife of the late Arthur Schuster, in and to all stocks, assets of all kinds and descriptions in the Interior Oil Corporation of America, a corporation, and the Rockwell Oil Co., a corporation, (It is my intention hereby to grant power to hypothecate, deal, transfer, sell, convey, deliver, and to vote, or in short, to deal with said stock or interest in any manner or in the same manner as I could do if I were there present.)"

It is, of course, undeniable that by this time—August 21, 1942—Joseph Schuster was aware that the Martin faction took the position that Arthur Schuster and later his widow owned 500 shares of Rockwell stock. Indeed, in November 1941 Joseph Schuster's attorney was given a copy of the letter dated June 3, 1937. Also by a letter from Clarence E. Mercer to Mrs. Mary Louise Carey dated November 10, 1942, it was stated "As undoubtedly you know I issued a Trustee's Certificate to you for 1950 shares of the capital stock of the Oil Corporation of America. This company was incorporated in Delaware and I presume you now hold that Trustee's certificate." This is additional evidence consistent with the Martin faction's contention that the Joseph faction as represented by Mary Louise Carey did not own 50% of the stock.

However, the Joseph faction points to certain letters and a proposed agreement which recite that Mary E. Schuster and Mary L. Carey each owned 50% of the Rockwell stock. The Martin faction explains these documents as an attempt to settle the dispute then existing between the parties. It points out that these memoranda also provide for a 3% royalty to Veronica Schuster which, they say, was to be in lieu of her stock interest. The Joseph faction contends that the royalty was given Veronica because she was unemployed, in need and, as Arthur's widow, should be taken care of during her life. Certain modest monthly payments had been made to Veronica commencing in 1938— after Arthur's death—but these ceased after a short time. If Arthur's widow had this stock interest, it is hard to understand why the payments, presumably from income, made to Veronica bear no recognizable relationship to her alleged percentage of ownership. Other testimony reveals that the Martin and Joseph factions bore equally the various expenses in connection with the oil lease.

The Joseph faction's explanation for granting Veronica an interest is persuasive in the light of Veronica's need and the past conduct of the parties with respect to Veronica. It also points out a very significant flaw in the Martin faction's explanation for the insertion of the royalty provision for Veronica in lieu of her stock interest. A draft agreement in settlement of the family differences which recited 50-50 stock ownership in Mary Louise Carey and Mary E. Schuster, as well as a royalty right in Veronica, did not purport to require the signature of Veronica. In a letter to Joseph's lawyer, Mary E. Schuster showed that both she and her father (Martin) did not contemplate procuring Veronica's signature to the agreement—yet Veronica was purportedly giving up her stock interest. We may recall that Martin Schuster, while not a practicing lawyer, did pass the bar examinations in his state. The failure of Martin and his daughter to require Veronica's signature— when they required four others—indicates a state of mind

negativing any understanding that Veronica possessed a stock interest.

It is also of real significance to note that the June 3, 1937 letter recites the 500 share stock interest in Veronica even though at that date her husband, Arthur, was still alive and working for the firm. No satisfactory explanation of this anomaly has been suggested by the Martin faction. Also the 1937 dissolution of Oil Corporation and the sale of the Cheyenne lease were instigated by Martin and Joseph. Arthur's alleged interest was apparently not considered even though Martin now contends that he was then the real owner of 100 shares of Oil Corporation stock.

The Martin faction emphasizes the importance of the execution of the power of attorney by Veronica to Joseph's son-in-law at Joseph's request. It says it shows a clear recognition of a stock interest in Veronica, and a recognition of that interest by Joseph. The Joseph faction explains the power on the ground that Veronica needed money and it was hoped this could be used to procure the royalty payments. A reading of the power shows that it did not unqualifiedly assume that Veronica had a stock interest. It was never used. I believe that Joseph in procuring this power was trying to protect himself in his fight with Martin. The motive was in my opinion similar to that which caused Martin to procure an assignment from Veronica in 1944. Both sought to protect themselves in the event Veronica was found to have any interest.

In the declaration of trust dated March 27, 1943, in which Clarence E. Mercer styles himself the duly elected and acting president of Rockwell, it is recited that he holds the 20,000 shares of stock in trust for the benefit of the following: 9,750 shares for Joseph N. Schuster and Mary Louise Carey jointly, 9,550 shares for Mary E. Schuster, 500 shares for Veronica Schuster and 200 shares for Clarence E. Mercer.

It is conceded that this instrument was drawn at the request of Martin Schuster, and there is no showing that the Joseph faction had any knowledge of or in any way acquiesced in the terms of the declaration of trust. It must be conceded that it shows once again that the Martin faction stated the stock ownership in Veronica many months prior to the date of the execution of the assignment by Veronica of her interest to Mary E. Schuster—Martin's daughter. However, it was in the midst of the running dispute, and Martin could not have then justified a direct holding of more stock than was held by the Joseph faction.

The testimony and documentary evidence leave much to be desired in the way of definiteness on the issue before the court. Apparently Martin had records of Interior which he did not see fit to introduce, although they might have thrown some additional light on the case. I was not impressed with his many evasive answers. Yet Joseph was also a poor witness. While the real issue is to ascertain whether or not Arthur had any stock interest originally, it is apparent that since no stock was ever registered in his name, and since I have concluded that the testimony and documents do not affirmatively prove such an interest, we must resolve the issue on the basis of the subsequent conduct of Martin and Joseph. Parenthetically, Veronica testified that she never knew of any stock interest held by Arthur. His right is asserted by the Martin faction as assignee. Certainly, its position is weakened by Veronica's testimony because it is not shown that her sympathies were with either faction—she appears to be a pawn in the struggle.

The only asset of value which has come down through the three corporations is the Cheyenne lease. It was admittedly paid for by the firm and Arthur Schuster never had any interest in the firm. The documentary proof tending to recognize an interest in Arthur was not shown to my satisfaction to have been within the knowledge of the

Joseph faction prior to the time Joseph and Martin "fell out". After that, both sides tried to strengthen their positions. The case is not easy, but I conclude that Arthur did not have any interest in Interior or, if he did, it was not passed down through Oil Corporation to Rockwell. I reach this conclusion on the basis of the foregoing discussion, and by giving greater weight to the following facts. Arthur was only an employee of the firm. The record of Interior's stockholders sets forth several individual stockholders, including Martin and Joseph. There is no good reason suggested why Arthur's name could not have been listed had he given any consideration in the form of leases, etc. I find Martin's evidence on this point unconvincing. There is no unchallenged documentary evidence existing prior to the inception of the dispute which shows that Joseph affirmatively recognized Arthur's or Veronica's stock interest. Martin's original records of Interior and the so-called June 3, 1937 letter were both prepared exclusively by some member of the Martin faction. Their other infirmities have been discussed.

I have already commented on the strength and weakness of the many documents. The failure to recognize Arthur's interest in 1932 by a written instrument is important when such an instrument was drawn with respect to 3,900 shares. It is also apparent that Arthur's alleged percentage of stock ownership in Interior and Oil Corporation were not the same even when viewed most favorably to Arthur. I also think that the June, 1937, letter must reflect on the Martin faction's case because it shows Veronica holding Arthur's interest while he was still living. Moreover, the letter was not actually seen or signed by Veronica until 1941, and she never knew or heard that Arthur had a stock interest.

We also have the papers looking toward a settlement. They contain the recital of a 50-50 interest in the two factions. There was a significant failure to provide for Ver-

onica's signature. Both Martin and Joseph failed to consider Arthur's or Veronica's right in dealing with the holding of Rockwell's assets—if any they had. This was particularly true in connection with the distribution of the income.

I conclude that the evidence entitled to the greater weight leads me to find that Arthur never had a stock interest in any of the corporations involved. Consequently, Veronica never had an interest which she could assign. The Rockwell stock is, therefore, now owned as follows:

| | |
|---|---|
| Mary L. Carey or Joseph Schuster shares | 10,000 shares |
| Mary E. Schuster | 9,800 shares |
| Clarence E. Mercer | 200 shares |

In view of my conclusions, the record clearly shows that there was no authority for Clarence E. Mercer to issue the stock in his own name and the name of his brother. Consequently, as between the stockholders, I conclude that the alleged stockholders' meeting of May 17, 1943, was a nullity. Unless the parties can agree otherwise, a master will be appointed to hold an election. The parties may first suggest to the court the mechanics for issuing the stock certificates to the real owners or their nominees. Thereafter, the old certificates which were deposited by the parties with the Register of this court can be cancelled.

An order accordingly will be entered on notice.

NOTE: On November 15, 1949, the parties were directed to reargue the question as to whether Joseph Schuster, rather than his daughter, Mary L. Carey, owned the 10,000 shares held by that faction. In a supplemental opinion reported *post p*. 264, 70 *A*. 2d 261, it was held that the shares in question were owned by the daughter.