DECISION
These matters are before the Court on the motion of defendant Women and Infants Hospital of Rhode Island (hereinafter "defendant" or "Hospital") for summary judgment pursuant to Super.R.Civ.P. 56. The plaintiffs — David and Carol Frisina, George and Susan Doyle, and Robert and Vickie Lamontagne — have filed timely objections to the defendant's motion.
 Facts/Travel
Each of the three cases brought against the defendant involves certain incidents that occurred at the Hospital's In Vitro Fertilization (hereinafter "IVF")[1] Clinic. The plaintiffs were all evaluated, and eventually accepted into, the Hospital's LYE Program.
In January 1992, Plaintiff Carol Frisina became a patient of the Endocrinology-Fertility Unit within the Department of Obstetrics and Gynecology at the Hospital. On or about August 5, 1992, the Frisinas signed two forms — the first entitled "Women and Infants Hospital of Rhode Island Informed Consent: In Vitro Fertilization (In Connection with Pre-Embryo Freezing)" and the second entitled "Women and Infants Hospital of Rhode Island Informed Consent and Contract for Pre-Embryo Freezing." In August 1992, Plaintiff Carol Frisina underwent a fresh cycle transfer by which a number of her eggs were harvested and fertilized. of the thirteen eggs that were successfully fertilized four were transferred to Plaintiff Carol Frisina in the first attempt at conception. The nine remaining embryos were frozen for future use. This initial transfer proved unsuccessful. In June 1993, the Frisinas were treated at the Hospital in preparation for the second attempt at conception using the previously frozen embryos. However, the Frisinas were informed that of the nine frozen embryos from the August 1992 process, only three were available. Moreover, the three frozen embryos were not successfully thawed or suitable for transfer. On July 24, 1995, the Frisinas brought suit against the Hospital for the loss and destruction of their embryos.
In September 1993, Plaintiff Vickie Lamontagne became a patient of the Endocrinology-Fertility Unit within the Department of Obstetrics and Gynecology at the Hospital. On or about October 4, 1993, the Lamontagnes signed two forms — the first entitled "Women and Infants Hospital of Rhode Island Informed Consent: In Vitro Fertilization (In Connection with Pre-Embryo Freezing)" and the second entitled "Women and Infants Hospital of Rhode Island Informed Consent and Contract for Pre-Embryo Freezing." Also, a third document entitled "INFORMED CONSENT AND CONTRACT FOR PRE-EMBRYO FREEZING WITH DONATION OF UNUSED PRE-EMBRYOS" was initialed by both Mr. and Mrs. Lamontagne and signed by Mr. Lamontagne. However, upon further examination of the document, Mrs. Lamontagne realized that it contained language stating that her unused pre-embryos would be donated. Since this was contrary to her intent, she did not sign the third document.
On October 27, 1993, Plaintiff Vickie Lamontagne underwent a fresh cycle transfer whereby a number of her eggs were harvested and seven were successfully fertilized. Plaintiff Vickie Lamontagne decided to have three embryos implanted for the first attempt at conception. After being prepared for transfer, Plaintiff Vickie Lamontagne was informed that four embryos had been lost. The remaining three embryos were transferred, and the procedure was successful resulting in the birth of a baby girl. It would later be discovered that only two of the embryos had actually been lost. To date, the two remaining frozen embryos are stored at the IVF Clinic. On October 16, 1995, the Lamontagnes brought suit against the Hospital for the loss or destruction of their embryos.
Finally, Plaintiff Susan Doyle became a patient of the Endocrinology-Fertility Unit within the Department of Obstetrics and Gynecology at the Hospital in August 1991. On or about January 2, 1992, the Doyles signed two forms — the first entitled "Women and Infants Hospital of Rhode Island Informed Consent: In Vitro Fertilization (In Connection with Pre-Embryo Freezing)" and the second entitled "Women and Infants Hospital of Rhode Island Informed Consent and Contract for Pre-Embryo Freezing." In January 1992, Plaintiff Susan Doyle underwent a fresh cycle transfer by which a number of her eggs were harvested and fertilized. Some of the resultant embryos were returned to her uterus, and six remaining embryos were frozen for future use. However, this transfer proved unsuccessful. In June 1992, the Doyles participated in another fresh cycle transfer. A number of embryos were implanted in Plaintiff Susan Doyle, and the five remaining embryos were frozen for future use. This transfer was successful and resulted in the birth of a healthy baby girl. In August 1995, Plaintiff returned to the Hospital to undergo certain testing in connection with the frozen cycle transfer. The Doyles wanted to use the five remaining embryos from the June 1992 process. The Doyles were again asked to read and sign a third document entitled, "Informed Consent for Transfer of Frozen Embryos to the Biological Mother." At this time, the Doyles were informed that the five remaining embryos from the June 1992 process had been inadvertently destroyed when the Hospital moved its IVF Clinic to its current location. Thereafter, the Doyles participated in a frozen cycle transfer using their January 1992 embryos, which proved unsuccessful. On October 31, 1995, the Doyles brought suit against the Hospital for the loss or destruction of their embryos.
In their complaints, the plaintiffs have asserted three theories of recovery: medical malpractice, bailment, and breach of contract. In all three counts, the plaintiffs contend that they have "suffered severe trauma and emotional anguish, pain and suffering." (P1. Frisinas' Compl. at 3, 4, 5.) (P1. Lamontagnes' Compl. at 3, 4, 5.) (P1. Doyles' Compl. at 3, 4, 5.) Moreover, in counts II and III, the plaintiffs also allege that they suffered the "loss of irreplaceable property." (P1. Frisinas' Compl. at 4 and 5.) (P1. Lamontagnes' Compl. at 5 and 6.) (P1. Doyles' Compl. at 5 and 6.)
Before this Court is defendant's motion for summary judgment which is premised on the argument that although these matters present unique issues — the legal status of human pre-embryos,[2] the duties owed to such pre-embryos and their progenitors, and the damages which may flow from their loss or destruction — the plaintiffs have nonetheless failed to state a claim upon which relief may be granted. The defendant contends that, as a matter of law, plaintiffs cannot recover damages for emotional harm based upon alleged loss of the pre-embryos; that it would be unfair and illogical to allow plaintiffs greater rights with respect to a frozen pre-embryo than with respect to a non-viable fetus; that Rhode Island law does not permit recovery for emotional harm resulting from alleged negligent conduct where plaintiffs have not suffered actual or threatened physical harm and have not witnessed physical injury inflicted on a relative; that as a matter of law plaintiffs cannot recover damages for emotional harm resulting from the loss of personal property whether as a result of breach of contract or negligence; and, finally, that plaintiffs' complaints should be dismissed because plaintiffs were specifically informed of, consented to and expressly assumed the risk of any loss or damage to the frozen pre-embryos. In turn, the plaintiffs advance a number of arguments in opposition to the summary judgment motion, including that both public policy and principles of tort law support recognition of plaintiffs' actionable rights in their pre-embryos; that emotional harm without physical manifestations but which is a natural and foreseeable consequence of defendant's negligent conduct, thus ensuring genuineness of the claim, satisfies the policy concerns governing recovery of damages for emotional harm in Rhode Island; that plaintiffs are entitled to a legal remedy for a legal harm even if the harm is strictly emotional harm; and, lastly, that since the legal status of the pre-embryo is unresolved in Rhode Island, the creation of a new body of law to resolve the issue, is required.
 Standard of Review 
Rule 56 of the Superior Court Rules of Civil Procedure empowers a trial justice, upon proper motion, to enter summary judgment in favor of the moving party "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Thus, it is the trial justice's task to determine the necessity of a trial by identifying genuine issues of material fact in dispute. Capital Properties. Inc. v.State, 749 A.2d 1069, 1079 (R.I. 1999); Rotelli v. Catanzaro, 686 A.2d 91
(R.I. 1996). In order to avoid summary judgment, the non-moving party cannot rely on mere allegations or denials in their pleadings and, instead, must by affidavits or otherwise set forth specific facts showing that there is a genuine issue of material fact. Id. at 1080 (citing Bourgv. Bristol Boat Co., 705 A.2d 969 (R.I. 1998)). A trial justice may properly grant summary judgment only when, after review of the evidence in the light most favorable to the nonmoving party, the trial justice concludes that there is no ambiguity and the moving party's claim warrants judgment as a matter of law. Sindelar v. Leguia, 750 A.2d 967, 970 (R.I. 2000); Buonanno v. Colmar Belting Co., 733 A.2d 712, 715 (R.I. 1999) (quoting Textron, Inc. v. Aetna Casualty and Surety Co.,638 A.2d 537, 539 (R.I. 1994)).
 Negligent Infliction of Emotional Distress 
At the outset, it should be noted that the law distinguishes between claims for mental anguish and mental suffering.[3] In the instant case, a review of plaintiffs' complaints reveals that there are no claims of contemporaneous physical injury that accompany the claims of mental or emotional anguish. Thus, the evidence indicates that plaintiffs' complaints are claims of mental anguish or emotional distress not arising from any physical injury.
Mental anguish or emotional distress claims can fall into one of two categories: either negligent infliction of emotional distress or intentional infliction of emotional distress.[4] Although success on these two claims requires the establishment of different factors, there is one requirement common to both: the physical symptomatology factor.[5]
The Rhode Island Supreme Court first recognized liability for negligent infliction of emotional distress in D'Ambra v. United States, 114 R.I. 643,338 A.2d 524 (1975).[6] Since that time, the Court has had occasion to revisit the matter and refine the requirements for such a claim. The court set out the elements of a claim for negligent infliction of emotional distress when it wrote that "a party must (1) be a close relative of the victim, (2) be present at the scene of the accident and be aware that the victim is being injured, and (3) as a result of experiencing the accident, suffer serious emotional injury that is accompanied by physical symptomatology."[7]
The defendant contends that plaintiffs cannot succeed on a claim for negligent infliction of emotional distress because plaintiffs fail to meet all of the required elements of the claim. The plaintiffs argue that their cases represent issues of first impression that do not fall within the ambit of prior decisions rendered by the Supreme Court. In addition, the plaintiffs disagree with the defendant's contention that the law is well-settled on the need to show physical symptomatology in order to succeed on a claim for emotional distress.
 A. Pre-embryos as Victims 
First, the defendant argues that since pre-embryos are not considered persons within the meaning of the law, pre-embryos cannot be victims and the first element of a negligent infliction of emotional distress claim cannot be met. To arrive at this conclusion, the defendant relies on the court's holding in Miccolis v. Amica Mutual Insurance Co., 587 A.2d 67, 71 (R.I. 1991), that a nonviable fetus is not a "person" within the meaning of the wrongful death statute. Defendant contends that through such a holding, the court also precluded recovery for "damages for loss of society and companionship." (Def.'s Mem. of Law at 8.) Thus, defendant argues that where the court has barred recovery for emotional harm relating to the death of a nonviable fetus, it is logical that the court would also preclude recovery for emotional harm relating to the loss of pre-embryos. Id.
Despite the "long period of time that IVF has been used and the number of couples who seek its miracles each year," there is a dearth of both statutory authority and case law regarding pre-embryos.[8] Although a majority of the decided cases deal with disputes regarding custody of the frozen pre-embryos, which is not at issue in the instant case, an examination of these cases is nonetheless warranted because they reveal the legal status accorded to pre-embryos.[9] The first case to consider the disposition of frozen pre-embryos in an action for dissolution of a marriage was Davis v. Davis, 842 S.W.2d 588 (Tenn. 1992), cert. deniedsub nom, Stowe v. Davis, 507 U.S. 911 (1993). Initially, Mrs. Davis wanted to retain the pre-embryos for future use, but she later decided she wanted to donate them to another couple. Mr. Davis always sought to have the pre-embryos discarded. The court considered the issue of whether pre-embryos should be "considered "persons' or "property' in contemplation of the law." Id. at 594. The court held that under Tennessee law pre-embryos could not be considered "persons."[10] In addition, the court held that any interest that Mr. and Mrs. Davis may have in the pre-embryos is not a "true property interest . . . [but] they do have an interest in the nature of ownership, to the extent that they have decision-making authority concerning disposition of the pre-embryos."Id. at 597. Thus the court concluded that "pre-embryos are not, strictly speaking, either "persons' or `property,' but occupy an interim category that entitles them to special respect because of their potential for human life." Id. Ultimately, the court held that the interest of the ex-husband in not being a parent outweighed the interest of the ex-wife who wished to donate the embryos to other persons and not to use them to achieve pregnancy herself.[11]
In Kass v. Kass, 696 N.E.2d 174, 179 (N.Y. 1998), another divorce dispute that involved the disposition of frozen embryos, the court also found that "pre-zygotes are [not] recognized as "persons' for constitutional purposes." The court resolved the matter by holding that the parties' agreement determined "who had dispositional authority over [the pre-zygotes]." Id. The court held that such agreements are presumed valid, binding and enforceable in any dispute between the parties. Id. at 180. However, the court did acknowledge the extraordinary difficulty in creating an explicit agreement regarding this matter. Id. Nonetheless, neither party disputed that the agreement, though authored by the IVF Clinic, properly expressed their intent to donate the pre-zygotes for research to the IVF facility. Id. Given the court's decision to focus on the agreement there was no reason for the court to decide if pre-zygotes are entitled to "special respect." Id. Finally, York v. Jones,717 F. Supp. 421 (ED Va. 1989), involved progenitors who brought suit against doctors who refused to release and transfer their pre-zygote to a hospital in California. The court focused on the cryopreservation agreement between the parties and noted that the manner in which the agreement was written indicates that the defendants "fully recognize
plaintiffs property rights in the pre-zygote and have limited their rights as bailee to exercise dominion and control over pre-zygote." Id. at 427.
Finally, a leading expert in the field has written that "[i]f negligent loss of an embryo is not covered under wrongful death statutes, it may be difficult to fashion a remedy. There is no way to show that particular embryos would have been implanted and gone to term."[12]
 B. Plaintiffs Were Not Present at the Scene 
The defendant next argues that the plaintiffs would fail to meet the second prong of the negligent infliction of emotional distress test because the plaintiffs were not present and did not witness the loss or destruction of the embryos. See Marchetti v. Parsons, 638 A.2d 1047, 1052 (R.I. 1994). Thus, "the loss is purely psychological and ordinarily will not occur in the presence of the parent, a situation that the tort system does not usually recognize."[13] The plaintiffs concede that because they did not witness the actual destruction or injury to the embryos "under traditional tort standards . . . [they] find themselves outside the scope of compensable emotional harm." (Pls. Mem. of Law at 10.) However, the plaintiffs contend that "the knowledge by the putative parents that loss or destruction of embryos entrusted to an IVF Clinic haswrongfully occurred must suffice to expose the Clinic to liability for its wrongful conduct." Id.
 C. Physical Symptomatology Requirement 
Finally, the defendant maintains that the plaintiffs did not suffer any actual or threatened physical harm due to the emotional anguish they experienced. In Reilly v. United States, 547 A.2d 894 (R.I. 1988), the Rhode Island Supreme Court followed the majority of jurisdictions when it imposed the requirement that "a plaintiff must suffer physical symptomatology to recover damages for negligent infliction of emotional distress."[14] The Court continues to adhere to its physical symptomatology requirement as evidenced by Vallinoto v. DiSandro,688 A.2d 830, 850 (R.I. 1997), wherein it wrote "a plaintiff alleging an infliction-of-emotional-distress claim in this jurisdiction must also establish that his or her mental anguish objectively manifested itself in the form of some physical ill."[15]
However, in a recent opinion, Adams v. Uno Restaurants. Inc.,794 A.2d 489, 493 (R.I. 2002), the Court appeared to relax the physical symptomatology requirement when it stated "[w]e do not find the absence of expert medical testimony to support the plaintiffs claim for damages resulting from his alleged emotional distress and humiliation to be fatal to that portion of his claim for damages." Id. at 493. Adams involved an appeal of a jury verdict in favor of the plaintiff who had been wrongfully terminated in violation of the Whistleblowers' Protection Act. Id. at 490. The plaintiff "claimed and testified that he suffered emotional distress and humiliation as a result of the defendant's wrongful conduct in initiating criminal proceedings against him that resulted in the loss of his National Guard security clearance and disqualification from an overseas National Guard mission. [However,] [h]e offered no expert medical testimony in support of his claim for emotional distress." Id. at 492. Although the court cites prior cases that set forth the physical symptomatology requirement, including Swerdlick v. Koch, Vallinoto v.DiSandro, and Reilly v. United States, the court distinguishes the case presented in Adams as where "an ordinary lay person or trial juror would be capable of determining without the aid of expert medical testimony whether emotional distress and humiliation could ordinarily and naturally follow from such events." Id. at 493. In upholding the jury's $7,500 award in damages, the court noted that "the trial evidence clearly reveals that the plaintiff Adams was particularly troubled over his being arrested for disorderly conduct and the resulting loss of his security clearance as a National Guard reservist." Id.
As stated previously, the plaintiffs disagree with defendant's contention that the law requiring a showing of physical symptomatology accompanying mental anguish is well-settled. The plaintiffs note that theReilly decision, relied upon by the defendant, was a close decision with two justices filing a dissenting opinion.[16] The plaintiffs contend that the facts of the instant case present the proper opportunity for the Court to "abandon the rule that denies all recovery for negligently inflicted emotional injury when that injury lacks any physical manifestation."[17] Moreover, plaintiffs contend that on one occasion, absent physical manifestation, the Rhode Island Supreme Court has allowed recovery on a claim of emotional distress. See Emerson v. Magendantz,689 A.2d 409 (R.I. 1997). In Emerson, the parents of a child born after the mother underwent sterilization procedures brought a medical malpractice action against the gynecological specialist who performed the procedure. Id. at 410. The court held that if a child is born healthy, then the plaintiff parents are entitled to recover for various expenses and losses but not for emotional distress.[18] However, if the child suffers from congenital defects, then the parents may recover special medical and educational expenses beyond normal rearing costs as well as damages for emotional distress.[19] Thus, the court did not require a physical manifestation of the emotional distress suffered by the plaintiff. Instead, the instant plaintiffs assert that the court accepted without comment the notion that the birth of a handicapped child brings with it emotional distress.
In addition, the plaintiffs note that the defendant's reliance on cases involving claims for emotional distress resulting from a defendant's breach of his/her duty to a third party is misplaced because plaintiffs' claims of emotional anguish are based on a breach of duty owed directly to the plaintiffs. See Reilly v. United States, 547 A.2d 894 (R.I. 1988) (plaintiff parents brought suit against obstetrician for negligent infliction of emotional distress from having witnessed the negligent delivery of their daughter); D'Ambra v. United States, 114 R.I. 643,338 A.2d 524 (1975) (plaintiff mother brought suit for negligent infliction of emotional distress caused by observing the death of her child); and Marchetti v. Parsons, 638 A.2d 1047, 1052 (R.I. 1994) (plaintiff parents brought suit for negligent infliction of emotional distress against driver who struck their child).
The plaintiffs bring to the Court's attention a number of cases wherein recovery for emotional distress without a showing of concomitant physical symptomatology has been permitted. See Perry-Rogers v. Obasaju,723 N.Y.S.2d 28 (2001) (plaintiffs awarded malpractice damages for emotional harm caused by defendants' mistaken implantation of plaintiffs' embryo into uterus of another woman); Del Zio v. Presbyterian Hospital,
1978 U.S. Dist. LEXIS 14450 (S.D.N.Y. 1978) (plaintiffs awarded $50,000 for their intentional infliction of emotional distress claim against doctor who destroyed their pre-embryos). A close reading of these cases indicates that the results reached are grounded on the differences between the law of the state of New York and that of the state of Rhode Island. The Rhode Island Supreme Court has specifically held that "a plaintiff must suffer physical symptomatology to recover damages for negligent infliction of emotional distress."[20] However, as previously noted, the court appears to have relaxed the physical symptomatology requirement in Adams v. Uno Restaurants, Inc., 794 A.2d 489 (R.I. 2002). There the court found that "clear objective and uncontroverted evidence concerning the plaintiffs complaint to the Warwick police; his arrest by the Warwick police; the criminal charge for disorderly conduct made against him; his arraignment on that charge; the revocation of his military security clearance and the resulting loss of his opportunity to accompany his National Guard unit in an overseas mission to Germany, " were sufficient to establish that plaintiff suffered emotional distress and humiliation due to defendant's actions. Id. at 493. In contrast, New York law clearly requires that "a plaintiff must produce evidence sufficient to guarantee the genuineness of the claim,"[21] of which "contemporaneous or consequential physical harm, " is believed to "provide an index of reliability otherwise absent in a claim for psychological trauma with only psychological consequences."[22] Thus in New York a plaintiff is not required to prove mental anguish through physical symptomatology. While these cases provide a better understanding of the issues at hand, they provide no authority or precedential value for this Court.
Finally, the plaintiffs argue that to bar recovery for emotional distress due to a lack of physical symptomatology fails to serve the interests of justice. See DeSpirito v. Bristol County Water Co.,227 A.2d 782, 783, 102 R.I. 50 (R.I. 1967) ("predicated upon the principle that the law is always concerned that an injured party shall be fully compensated for whatever injury he may have sustained");Auchincloss v. Halloran Const. Co., 105 R.I. 565, 571, 253 A.2d 622, 625 (R.I. 1969); Proffitt v. Ricci, 463 A.2d 514, 518 ("[c]ompensatory damages are awarded to a person in satisfaction of, or in response to, loss or injury sustained"). Moreover, one author has written that "[n]egligent or inadvertent destruction of embryos, due to equipment malfunction or human error, is also likely to be actionable or should be so because of the significant financial, physical, or emotional loss that each imposes."[23]
Thus, the current state of Rhode Island law with respect to the required elements for a claim of negligent infliction of emotional distress appears to present an insurmountable obstacle for the plaintiffs. First, it is unlikely that the plaintiffs can establish that the pre-embryos were victims. To date, the Rhode Island Supreme Court has yet to bestow any legal status on pre-embryos. Furthermore, the defendant presents a strong and compelling argument that a logical extension of the court's holding in Miccolis v. Amica Mutual Insurance Co., 587 A.2d 67, 71 (R.I. 1991), that a nonviable fetus is not a "person" within the meaning of the wrongful death statute, would preclude pre-embryos from being considered victims. Second, it is undisputed that the plaintiffs did not witness the actual loss or destruction of the embryos. Finally, the plaintiffs have not claimed that they suffered any physical manifestations of their emotional distress though the third requirement for a successful claim of negligent infliction of emotional distress requires the plaintiff to show physical symptomatology. Nevertheless, given that the instant plaintiffs face tremendous difficulty in meeting all three requirements established by the court in Marchetti v.Parsons[24] for a negligent infliction of emotional distress claim, defendant's motion for summary judgment with respect to this claim must be granted.
 Emotional Distress based on Loss of Personal Property 
The plaintiffs also allege in Counts II and III that they have suffered the "loss of irreplaceable property." The defendant contends that there are no Rhode Island cases permitting an award of damages for emotional distress from the loss of property based on breach of contract or negligence.
However, in Hawkins v. Scituate Oil, 723 A.2d 771 (R.I. 1999), the Rhode Island Supreme Court held that when a tortfeasor's negligence deprives a family of the use and enjoyment of their home then the family is entitled to recover damages for their resulting inconvenience, discomfort, and annoyance. The plaintiff homeowners' basement was inadvertently filled with 100 gallons of home heating oil, thereby rendering the premises uninhabitable for sixteen months. Id. The court allowed recovery of damages for the discomfort and annoyance suffered by plaintiffs
 "[b]ecause property-loss victims like the Hawkins typically will experience inconvenience, discomfort, and annoyance following such a tangible deprivation as occurred in this case — albeit no corporeal symptoms or medical expertise corroborates such a loss — we have no need to insist upon the heightened levels of proof that we would otherwise require in establishing pure emotional-distress claims. . . . [i]n cases like this one involving a physical interference with or a loss of a possessory interest in real property, the prevention of trumped-up or specious-damage demands for alleged intangible personal injuries is of less an evidentiary concern than it is in the context of cases alleging a mere intentional or negligent infliction of emotional distress." Id. at 773.
As the earlier discussion indicates, while courts have not considered pre-embryos persons within the meaning of the law, they have been deemed "property"[25] of progenitors or the progenitors are deemed to have an "interest in the nature of ownership."[26] Thus, plaintiffs base their claim of emotional distress on the loss or destruction of their "irreplaceable property, " their pre-embryos. In turn, the defendant maintains that since there was an 80 percent chance that plaintiffs would not achieve pregnancy, the plaintiffs did not actually suffer any loss. Thus while the plaintiffs identify their loss as the actual loss of their pre-embryos, the defendant characterizes the loss as that of the possibility of achieving pregnancy, which was never guaranteed by the Hospital.
The defendant also argues that damages in this situation would be difficult to assess. The defendant relies on DeSpirito v. Bristol WaterCo., 102 R.I. 50, 227 A.2d 782, 784 (1967), for the proposition that recovery for negligent damage to personal property is generally limited to the difference between the fair market value immediately before the accident and the fair market value immediately after the accident. In addition, ""any fanciful or sentimental value' is excluded." (Def.'s Mem. of Law at 16.) However, the court explained in DeSpirito that in certain cases:
 "instead of adhering to the before and after market values as the rule of damages, the courts, giving due consideration to the attendant circumstances and conditions, permit recovery of the actual value to the owner of the thing lost or damaged, excluding, of course, any fanciful or sentimental value that might be placed on it."[27]
The defendant also maintains that it is a well-established rule that the plaintiffs cannot recover for emotional distress based on a breach of contract. See Buenzle v. Newport Amusement Ass'n, 29 R.I. 23, 68 A.2d 721
(1908). However, the plaintiffs maintain that the cases relied upon by the defendant are "inherently distinguishable given the nature of the issue addressed therein." (Pls.' Mem. of Law at 17.) In Buenzle, 29 R.I. at 723, plaintiff brought a breach of contract action based on the "sale of an admission ticket to the defendant's dance hall and the refusal of the defendant to admit the plaintiff." The court held that "the rule of assessment of damages in this case must be confined to the actual pecuniary loss, and cannot be extended to include mental suffering." Id. However, the court noted that
 "the cases with which [the plaintiff] sought to analogize the case have to do with contracts largely involving feeling and sentiment, as in contracts of marriage, or contracts relating to illness, death, and burial, where the feelings and sentiments of the complaining party are so involved and in wrought that they form a necessary and unavoidable ingredient in the matter of the contract, and are very properly held to be within the contemplation of both parties as an inducement and consideration of the contract, and so to be considered in the award for the breach." Id. at 722-23.
Thus, the court based its holding on the fact that "mere desire and intention to attend a theatrical performance, a dance, a concert, a race, or other such amusement, cannot be held to involve any such feelings, sentiments, affections, passions, emotions or other mental agitations as in the cases cited by the plaintiff in the endeavor to extend this rule." Id. at 723. However, the instant case which involves the "unique qualities of the IVF context" is more closely analogous to the cases cited by the plaintiff in Buenzle in his effort to extend the rule to permit recovery for emotional distress based on breach of contract. (Pls. Mem. of Law at 18.) The Plaintiff notes that:
 "[t]he IVF experience is physically taxing for the prospective mother and emotionally draining for both prospective parents. Clinics report that couples attempting IVF often show an abnormal attachment to the embryos, sometimes even naming them, and experience deep depression if successful implantation does not occur."[28]
The defendant also cites Restatement (Second) Contracts § 353 (1979), which provides that "[r]ecovery for emotional disturbance will be excluded unless the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." A review of Rhode Island caselaw reveals that the Rhode Island Supreme Court has not adopted Restatement (Second)Contracts § 353 (1979). Comment (a) provides that common examples of the second exceptional situation involve "contracts of carriers and innkeepers with passengers and guests, contracts for the carriage or proper disposition of dead bodies, and contracts for the delivery of messages concerning death." Id. at 149. The defendant asserts that the plaintiffs' cases do not fall within the first or second situations described in Restatement (Second) Contracts § 353 (1979). However, the plaintiffs contend that the second exceptional situation, particularly contracts for the proper disposition of dead bodies, can involve the same kind of emotional anguish that they have suffered in the instant case, and thus lends support for the claims advanced in their cases.
This Court finds that the plaintiffs are seeking to recover for the physical loss of their pre-embryos rather than for the loss of the possibility of achieving pregnancy as claimed by the defendant. Moreover, the Court finds merit in the argument raised by plaintiffs that recovery for damages for emotional distress based on the "loss of irreplaceable property," the loss of their pre-embryos, is permissible under the Rhode Island Supreme Court's holding in Hawkins v. Scituate Oil, 723 A.2d 771
(R.I. 1999). In addition, although the defendant correctly asserts that Rhode Island law does not permit recovery for emotional distress due to breach of contract, Buenzle v. Newport Amusement Ass'n, 29 R.I. 23,68 A. 721 (1908), the case contains language suggesting that such damages might be available in certain factual scenarios. Moreover, the facts surrounding the instant cases vary so significantly from those wherein the court would not permit recovery for emotional distress arising out of a breach of contract, that the rule should not apply to the cases at bar. Accordingly, defendant's motion for summary judgment on the issue of damages for emotional harm due to the loss of irreplaceable property must be, and, is denied.
 Assumption of Risk 
The final argument raised by the defendant is that the plaintiffs assumed the risk of any loss or damage to the frozen pre-embryos as evidenced by their execution of certain documents. A document entitled "INFORMED CONSENT: IN VITRO FERTILIZATION (In Connection with Pre-Embryo Freezing)" was signed by each of the plaintiffs. This form contained language stating that although the Hospital may proceed with due care, there were twelve events which could nonetheless prevent pregnancy, including that "a laboratory accident may result in loss or damage to the fertilized egg(s) or pre-embryo(s)."[29] Also, each of the plaintiffs signed another document entitled "INFORMED CONSENT AND CONTRACT FOR EMBRYO FREEZING, " which contained the following language:
 "3. Husband and Wife acknowledge, understand and agree that despite the Hospital, its physicians and its employees proceeding with due care, it is possible that a laboratory accident in the Hospital may result in loss or damage to one or more of said frozen embryos."[30]
Also, the Doyles and the Frisinas, signed a document entitled "INFORMED CONSENT FOR TRANSFER OF FROZEN EGGS TO THE BIOLOGICAL MOTHER, " which also stated that "a laboratory accident may result in loss or damage to the fertilized egg(s) or pre-embryo(s)."[31] Plaintiffs maintain, however, that they were "NOT asked to, nor did they assume the risk that their embryos might be destroyed because of the failure of those participating in the IVF program to exercise due care for the safety of the embryos." (Pl.'s Mem. of Law at 21.) Rather, the plaintiffs contend that they accepted only the risk of a laboratory accident that could occur despite the defendant's due care.
The Rhode Island Supreme Court has had occasion to address the doctrine of assumption of risk. The Court has stated "the doctrine of assumption of risk is an affirmative defense, which, when applicable, operates to absolve a defendant of liability for having created an unreasonable risk." See Walker v. Johnson, 723 A.2d 1115, 1117 (R.I. 1999) (quotingRicky v. Boden, 421 A.2d 539, 543 (R.I. 1980)). Thus, in the absence of an express agreement, "a defendant must prove that a plaintiff "knew of the existence of danger, and appreciated its unreasonable character and then voluntarily exposed himself [or herself] to it."' See Hennessey v.Pyne, 694 A.2d 691, 699 (1997) (quoting Labrie v. Pace MembershipWarehouse Inc., 678 A.2d 867, 872 (R.I. 1996)). The defendant contends that an express agreement exists as evidenced by the many and varied informed consent documents signed by the plaintiffs. Moreover, the defendant asserts that given the express agreement there is no need to ascertain (1) whether the plaintiffs knew of the existence of the risk associated with the loss or destruction of their pre-embryos and (2) whether the plaintiffs appreciated the unreasonable character of this risk.
Also, the defendant notes that the Rhode Island Supreme Court has "upheld exculpatory-indemnification clauses that negate liability for an individual's own negligence if the clause is sufficiently specific." SeeRhode Island Hospital Trust National Bank v. Dudley Service, 605 A.2d 1325, 1327 (R.I. 1992) (citing Corrente v. Conforti Eisele Co., 468 A.2d 920, 922 (R.I. 1983), and Ostalkiewicz v. Guardian Alarm, 520 A.2d 563, 566 (R.I. 1997)). In Dudley Service, 605 A.2d 1325, 1326 (R.I. 1992), a breach of contract, negligence and conversion action was brought against a storage company for the loss of goods at the storage facility. The storage agreement contained an exculpatory clause whereby the renter of the storage space agreed not to hold the storage company liable for the loss or damage of any stored goods even if the loss were due to the storage company's negligence. Id. The court found the "lease agreement entered into by the parties [to be] clear and unambiguous" and noted that the contract specifically stated that the storage company "was not an insurer of the property in each storage unit." Id. at 1327. Moreover, the court's decision was based on the fact that the "parties were in an equal bargaining position. Both parties were sophisticated and were dealing at arm's length when they entered into this lease agreement."[32]
Finally, the defendant notes that agreements between progenitors and IVF clinics have been consistently upheld as valid and binding by several courts. See Kass v. Kass, 696 N.E.2d 174, 179 (N.Y. 1998) and Davis v.Davis, 842 S.W.2d 588 (Tenn. 1992), cert. denied sub nom, Stowe v.Davis, 507 U.S. 911 (1993). But see A.Z. v. B.Z., 431 Mass. 150, 150 (2000).[33]
It should be noted, however, that these courts dealt solely with the agreement provisions regarding disposition of the pre-embryos upon divorce of the progenitors. Thus, these courts have not dealt squarely with the issue of whether exculpatory clauses in agreements between IVF clinics and progenitors should be upheld.
In the instant case, in order to sustain the defendant's assumption of risk defense, this Court would have to find that provisions regarding loss or damage that may result to the embryos due to a laboratory accident contained in the various informed consent documents were "sufficiently specific"[34] and "the parties intention to hold harmless is clearly and unequivocally expressed in the contract."[35] Not surprisingly, there is substantial literature on the issue of prior agreements regarding frozen embryos. The defendant relies on Robertson,Prior Agreements for Disposition of Frozen Embryos, 51 Ohio State L.J. 407, 414 (1990) for the proposition that "IVF programs have the right to set some conditions under which they offer freezing." In addition, "[a]n IVF program has a strong interest in being sure that couples freely and knowingly consent to the risks and benefits of IVF, " and because embryo disposition agreements are generally executed simultaneously, "they are likely to be as validly made."[36] However, this same expert has written that "lawsuits against IVF programs and embryo banks require that release clauses in consent forms not be binding in cases of negligence, and that there be a legal remedy for negligent destruction or disposition of embryos."[37] In addition, it has been claimed that "[i]n disputes involving frozen embryos . . . the courts have largely dispensed with any meaningful review of the contracting process by which dispositional terms are established."[38] Waldman further states that "despite their aspirational title, informed consent forms often reflect accessions to recommended treatment that are neither deliberate, thoughtful or informed."[39] Finally, she writes that "[p]hysician use of consent forms to accomplish the information flow required by [the] informed consent doctrine creates a documentary record of patient information that overstates the patients s exercise of conscious will."[40]
In the cases at bar, each of the plaintiffs during his or her deposition testimony admits to having been presented with the informed consent documents and signing those documents, which contain the provision that damage or loss to the embryos may result due to a laboratory accident. However, it appears that plaintiffs interpreted the exculpatory clauses differently than defendant as evidenced by the following exchange during Susan Doyle's deposition:
 Q. So you understood when you signed this form that you were accepting the risk that a laboratory accident could cause loss or damage to the fertilized eggs or pre-embryos, correct? Mr. Oliviera: Objection.
 A. I signed accepting that if there was an accident, it would be a careful accident, not an accident of carelessness or sloppiness. That's what I initialed and what I signed.
 Q. Does it say something in this form that you can point me to about a careful accident, not a sloppy accident?
 A. Well, in the form — would you repeat your question, please? Mr. Oliviera: Read it back please (Last question read.)
 A. To me a careful accident — to answer your question, I'm sorry. There is no description as what a careful accident and what a careless accident is on this form.
 Q. Okay. And when you signed this form or at anytime before you signed this form, you didn't tell somebody that you understood the form to only refer to a so-called careful accident, as opposed to a sloppy accident, did you?
 A. I'm sorry. Would you repeat that.
 Q. Before you signed this form, you didn't tell anybody that you understood this to only be referring to a so-called careful accident, did you?
 A. I don't recall.
 Q. You have no recollection of saying that, do you?
 A. No.
 Q. Now, can you tell me, ma'am, what a careful accident is, as compared to a sloppy accident?
 A. M-hm. (Affirmative.) Yes. A careful accident is one, I believe, that is an act of God. A careless or a sloppy accident is one of human error.
 Q. And where did you develop that understanding?
 A. It's common sense. (Dep. on August 2, 2000 at 56-57.)
Plaintiffs understood the exculpatory clauses in the informed consent documents to mean that where the defendant acted with due care and a laboratory accident nonetheless occurs the defendant would be absolved of liability for loss or destruction of their pre-embryos. Plaintiffs did not construe the exculpatory clauses to excuse the defendant from liability where loss or destruction of their pre-embryos resulted from defendant's negligence, such as the loss of pre-embryos during the clinic's relocation to a new facility.
Thus, defendant's assumption of risk defense is based on the various informed consent documents, read and signed by the plaintiffs, which specifically mention the possibility of a laboratory accident that might lead to the loss or destruction of the embryos. However, the assumption of risk defense applies only where the express agreement between the parties is sufficiently specific and the parties' intention to hold harmless is clearly and unequivocally expressed in the contract. The provisions at issue stated that the progenitors were aware that even where the Hospital "proceeds with due care, " an accident that could lead to loss or destruction of the embryos, may nonetheless occur. However, this language does not appear to cover those situations where loss or destruction arises because the Hospital has acted negligently or without due care. Accordingly, defendant's motion for summary judgment on its defense of assumption of risk is denied.
 Conclusion 
Summary judgment will be granted when this Court finds that there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. After due consideration of the arguments advanced by counsel at oral argument and in their memoranda, as well as a review of the other materials properly before this Court, this Court finds there is no genuine issue of material fact as to plaintiffs' allegation of negligent infliction of emotional distress. However, this Court finds that genuine issues of material fact exist with respect to plaintiffs' claim of emotional distress due to breach of contract and defendant's assumption of risk defense. Therefore, defendant's motion for summary judgment is granted in part and denied in part.
Counsel shall submit an appropriate order and judgment for entry.
[1] In vitro fertilization is one of numerous procedures used in the active treatment of infertility in which "human OOCYTES (eggs) are retrieved from the ovary with a needle either under laparoscopic or ultrasound visualization, fertilized in the laboratory, and then transferred as embryos into the woman's uterus." Ausman Snyder's,Medical Library, § 1:32 at 177 (1988). Also, "[i]n vitro fertilization ("IVF"), a procedure which attempts to achieve conception in a laboratory rather than within the woman, accounts for 70% of the [assisted reproductive technologies] procedures that couples undergo. The IVF process . . . involves the removal of eggs and their exposure to sperm in a petri dish. After fertilization, generally one to three pre-embryos are transferred to the woman's uterus where they will, hopefully, continue to develop and result in the birth of a child. To increase the likelihood of success while reducing the cost of the procedure, many couples choose to cryopreserve pre-embryos for future use. . . . This process freezes the pre-embryos in liquid nitrogen." See
David H. Fiestal, A Solomonic Decision: What Will be the Fate of FrozenPreembryos?, 6 Cardozo Women's L.J. 103, 105-07 (1999) (citations omitted).
[2] The term preembryo is used to describe the four-to-eight cell stage of a developing fertilized egg. See A.Z. v. B.Z., 431 Mass. 150, 151 n. 1 (2000) (citations omitted).
[3] ""[M]ental anguish' and "emotional distress' appear to be used most often in cases where mental suffering in some form is the principal injury for which recovery is sought; whereas the use of the term "mental suffering" seems to be mainly confined to cases where the suffering element is accompanied by a claim of physical injury or pain Mental anguish can be characterized as "unpleasant mental sequelae' — such as worry, concern, grief humiliation, embarrassment and depression — which are not directly related to pain sensations." See Harper, James and Gray, The Law of Torts, Vol. 3, § 18.4 at 68 1-82 (citations omitted) (1986). There are a number of situations where the Court allows recovery for mental suffering without a requisite showing of physical injury. In Arlan v. Cervini, 478 A.2d 976, 978 (RI. 1984), the court wrote "mental suffering is compensable whether the underlying act that caused the plaintiffs injuries is purely mental, purely physical, or a combination thereof." In Arlan, the Court held that mental suffering, which may include nervousness, grief, anxiety, worry, shock, humiliation, embarrassment, or indignity, arising from consciousness of a facial or bodily scar, is a compensable element of damages." Id. at 980. In addition, the Court does not require a showing of physical symptomatology in false imprisonment cases or cases of defamation per se. See Swerdlick v. Koch, 721 A.2d 849 (R.I. 1998); Bosler v. Sugarman,440 A.2d 129 (RI. 1982); Webbier v. Thoroughbred Racing ProtectiveBureau, 254 A.2d 285, 105 R.I. 605 (R.I. 1969). Moreover, the Court has not required proof of physical symptomatology where the mental suffering is caused by the invasion of a legal right. Hawkins v. Scituate Oil,723 A.2d 771 (RI. 1999).
[4] The Rhode Island Supreme Court expressly adopted the Restatement (Second) of Torts § 46 (1965) rule, which provides, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm" in Champlin v. Washington Trust Company, 478 A.2d 985 (RI. 1984).
[5] In Clift v. Narragansett Television L.P., 688 A.2d 805, 813 (RI. 1996), the Court wrote "this Court has specifically stated that in Rhode Island no difference exists between negligent and intentional infliction of emotional distress claims in respect to the need for physical symptomatology."
[6] The Court specifically held that "a nonnegligent mother, who although suffering no physical impact suffers serious mental and emotional harm accompanied by physical symptoms from actually witnessing the death of her nonnegligent minor child as a direct result of the defendant's negligence, may maintain an action for negligent infliction of emotional distress, despite the fact that she herself was never in physical danger." Id. at 657-58.
[7] Marchetti v. Parsons, 638 A.2d 1047, 1052 (RI. 1994).
[8] See Fiestal infra note 1 at 107.
[9] Kass v. Kass, 696 N.E.2d 174 (N.Y. 1998) (custody issue between the progenitors); Davis v. Davis, 842 S.W.2d 588 (Tenn. 1992), cert. deniedsub nom, Stowe v. Davis, 507 U.S. 911 (1993) (custody issue between the progenitors); York v. Jones, 717 F. Supp. 421 (ED Va. 1989) (custody dispute between progenitors and clinic).
[10] Id. To arrive at this conclusion, the court considered the interplay between state statutes, like the Tennessee Wrongful Death Act, and previous court decisions. In addition, the court noted that "pre-embryos have never enjoyed protection as "persons' under the federal law." Id. (discussing Roe v. Wade, 410 U.S. 113, 35 L.Ed.2d 147, 93 S.Ct. 705 (1973) and Webster v. Reproductive Health Services, 492 U.S. 490, 106 L.Ed.2d 410, 109 S.Ct. 3040 (1989)).
[11] Id. at 604. In disputes involving the proper disposition of the embryos, the court will first look at the preferences of the progenitors. However, if there is a dispute, then the court will rely on the parties' prior agreement. However, where there is no prior agreement, then the relative interests of the parties in using or not using the embryos will be weighed. Finally, the court will consider whether there are no reasonable alternatives for one of the parties to achieve pregnancy.
[12] See John A. Robertson, Reproductive Technology and Reproductive Rights: In the Beginning The Legal Status of Early Embryos, 76 Va. L. Rev. 437, 460 n. 61 (1990) (Citations omitted.)
[13] See Robertson, infra note 12.
[14] Id. at 899. The court essentially adopted the law contained in Restatement (Second) Torts § 436A, which provides that:
 "[i]f the actor's conduct is negligent as creating an unreasonable risk of causing either bodily harm or emotional disturbance to another, and it results in such emotional disturbance alone, without bodily harm or other compensable damage, the actor is not liable for such emotional disturbance." Id. at 896-97.
The court based its adoption of the rule on concerns regarding the "inherent difficulty of proof' and the desire not to "impose potentially unlimited and undeserved liability upon a defendant who is guilty of unintentional conduct." Id. at 897-98.
[15] The plaintiff in Vallinoto presented evidence that the emotional trauma inflicted upon her manifested itself in various physical ailments, including "recurring nightmares, anxiety attacks, headaches, shingles, nausea, crying fits, and flashbacks. . . [and] symptoms of posttraumatic stress disorder." Id. at 851.
[16] 547 A.2d 894, 899 (RI. 1988) (Fay, C.J., and Kelleher, J., dissenting).
[17] Id. at 899. The dissenters argue that the concerns raised by the majority regarding spurious claims and excessive damages can be addressed "[b]y setting strict standards of proof, scrutinizing carefully the circumstances of each case, relying on expert psychological testimony, and utilizing a reasonable-person standard." Id. at 902.
[18] Id. at 414. Plaintiffs would be entitled to recover the "medical expense of the ineffective sterilization procedure, the medical and hospital costs of the pregnancy, the expense of a subsequent sterilization procedure, loss of wages, loss of consortium to the spouse arising out of the unwanted pregnancy, and medical expenses for prenatal care, delivery, and postnatal care."
[19] Id. The court specifically wrote "[a]lso in the event of the birth of a physically — or a mentally — handicapped child, the parents should be entitled to compensation for emotional distress."
[20] Reilly v. United States, 547 A.2d 849 (RI. 1988).
[21] Kaufman v. Physical Measurements, 207 A.D.2d 595, 596 (1994).
[22] Johnson v. State of New York, 37 N.Y.2d 378, 381 (1975).
[23] See Robertson, infra, note 12.
[24] 638 A.2d 1047, 1052 (RI. 1994).
[25] York v. Jones, 717 F. Supp. 421 (Ed. Va. 1989).
[26] Kass v. Kass, 696 N.E.2d 174, 179 (N.Y. 1998).
[27] Id. at 784. See Judith D. Fischer, Misappropriation of Human Eggsand Embryos and the Tort of Conversion, 32 Loy. L.A.L.Rev. 384, 419 (1999) ("[f]ixing a market value for eggs or embryos is difficult as well as unsettling.") See also Robertson, infra note 12, ("Yet some remedy for negligent destruction or disposition of embryos seems justified. Legal concepts of tort and property may have to evolve to take care of this situation. A practical solution would be to have the couple and program or storage bank set liquidated damages for negligent loss of embryos in the initial storage contract. A sum based on the cost of creating the embryo plus a percentage for emotional damages might be a reasonable basis for most losses, and should be no more offensive than similar provisions in accident or life insurance policies." (citing Robertson,Ethical and Legal Issues in Cryopreservation of Human Embryos, 47 Fertility Sterility 371, 379-80 (1987)).
[28] Id. at 10 n. 5 (quoting Tanya Feliciano, Davis v. Davis: WhatAbout Future Disputes?, 26 Conn. L. Rev. 305, 308-09 (1993)).
[29] "INFORMED CONSENT: IN VITRO FERTILIZATION (In Connection with Pre-Embryo Freezing)" at 4. The Doyles signed the document on January 1, 1992, the Lamontagnes signed the document on October 4, 1993, and the Frisinas signed the document on August 5, 1992.
[30] "INFORMED CONSENT AND CONTRACT FOR EMBRYO FREEZING" at 7. The Doyles signed the document on January 2, 1992, the Lamontagnes signed the document on October 4, 1993, and the Frisinas signed the document on August 5, 1992.
[31] "INFORMED CONSENT: IN VITRO FERTILIZATION (In Connection with Pre-Embryo Freezing)" at 4. The Doyles signed the document August 4, 1995 and the Frisinas signed the document on August 10, 1993.
[32] Id. at 1328. Thus, the language of the exculpatory clause and the bargaining positions of the parties play significant roles in the decisions reached by the Court. In Ostalkiewicz v. Guardian Alarm,520 A.2d 563, 564 (RI. 1997), plaintiff contracted with Guardian Alarm for the installation and maintenance of a burglar alarm system. The agreement at issue stated that Guardian "was not to be an insurer and that it would not be liable for any loss occasioned by the malfeasance or misfeasance in the performance of the System or the services under the Agreement or for any loss or damage sustained through burglary, theft, robbery fire or other cause." In addition, the Court found that the parties were dealing at an arm's length in this agreement. Id. at 564. Also, in Corrente v. Conforti Eisele Co., 468 A.2d 920, 923 (R.I. 1983), the Court found that under the express agreement between the parties the subcontractor agreed to hold the general contractor harmless from all claims of negligence. The Court also found the parties had acted at arm's length. Id.
[33] The Massachusetts Supreme Judicial Court also addressed the issue of the disposition of frozen pre-embryos in the context of a divorce dispute where the wife sought the pre-embryos for future implantation and the husband sought to have the pre-embryos destroyed. Although the husband and wife signed consent documents that discussed the disposition of the pre-embryos, the Court noted that the husband typically signed blank documents which would later be filled in by the wife. Id. at 155. During one such instance, the wife subsequently added to the document that should they "become separated, " the pre-embryos would be returned to her for future implantation. Id. The court found that the "purpose of the form (drafted by and to give assistance to the clinic) and the circumstances of execution were dubious at best that it represents the intent of the husband and wife regarding disposition of the pre-embryos in the case of a dispute between them." Id. at 158. Thus, the Court refused to enforce the agreement given the circumstances of the case.Id. Moreover, the Court held that public policy would prevent their enforcement of an agreement that "would compel one donor to become a parent against his or her will." Id. at 160.
[34] Rhode Island Hospital Trust National Bank v. Dudley Service,605 A.2d 1325, 1327 (RI. 1992).
[35] Corrente v. Conforti Eisele Co., 468 A.2d 920, 922-23 (RI. 1983).
[36] Id. See Robertson, infra note 12.
[37] See Robertson, infra note 12.
[38] Ellen A. Waldman, Disputing Over Embryos: of Contracts andConsents, 32 Ariz. St. L.J. 897, 900 (2000).
[39] Id. at 918.
[40] Id. at 921 (Citations omitted).